We'll hear argument next in Case 12-138, BG Group v. Republic of Argentina. Mr. Goldstein. Mr. Chief Justice, may it please the Court, we ask you to resolve this case narrowly by reaffirming that an arbitrator rather than a court presumptively resolves a dispute over a precondition to arbitration. That holding would decide the question presented, resolve the circuit conflict, and govern 99 percent of the cases in the lower courts. Argentina wants you to decide a different issue. Its position in this Court is that there is no arbitration agreement with my client in the first place, so it says a precondition to that nonexistent agreement is irrelevant. Now, Mr. Goldstein, do you take the position that parties can't, by contract say, this particular precondition is goes to the parties' consent to arbitrate? Goldstein, we do not take that position. If a party were to say that, as the governments in NAFTA have done, as the Solicitor General points out, is the language of the U.S.-South Korea bilateral investment treaty, unlike this one, we think it would be settled that a court would resolve a dispute over a precondition. Sotomayor, so if the issue is what did the parties, as I see it, what did the parties intend on this question, why isn't the first option's Howsam divide the one that we should follow in this setting? The Solicitor General is suggesting that we shouldn't follow that. We should give some sort of heightened deference to the foreign state, but I'm not sure why. Because the issue is always about what did the parties intend. And if the issue is always about that, don't we look at the text, the custom and practice of the industry, the behavior between the parties? Don't we look at all of the factors we normally look at in deciding whether something goes to a substantive or procedural issue? Goldstein, so let me see if I can. Sotomayor, it's not that we hold absolutely that in every situation a precondition is subject to an arbitral decision. We look to those, to the issue of consent, don't we? Well, a couple of things about that. You do, you have held in Howsam that if there is a precondition to arbitration, it is presumptively decided by the arbitrators rather than the courts, so that can be a part of it. Maybe that's why the government is saying we shouldn't treat it as a presumption. We should just treat it as. All right. Maybe I can help by locating the parties' different arguments in this case, because there are a lot of them. We have said, of course, that we think you should decide the question presented. Argentina wants you to go beyond the question presented. We can talk about whether that's appropriate. If you did decide the question of consent, I think you would do it in a three-part opinion, and some of the parts are contested and some aren't. This is how I would write the opinion. Part 1 would say, look at our decision in Howsam, and it's undisputed here that if this was an ordinary contract case just between two American companies, then BG Group would win, because this looks just like a procedural precondition. It's like the John Wiley staged grievance procedure, and I don't think the other side argues against that. Then the other side has given you two different arguments for why you wouldn't apply Howsam and why you might have a different analytical framework. The first argument, we could call it part 2 of the opinion, is the argument of the United States. And what the United States says is, look, the difference between this and Howsam is it's an international case. And what's different in international cases is that when you dealt with Howsam, you dealt with a set of expectations between parties agreeing to arbitrate that may not apply in the international context, and so maybe it's different. Now, this — and the reason they say that it's different is that an international case, when it's cited in the United States, is governed by the New York Convention. And in a New York Convention case, whether it's a commercial case, whether it's an international treaty arbitration case, what the rule of judicial review is, and that's what we're looking at here, do the arbitrators finally decide the question or does a court on judicial review decide it? In a New York Convention case, you look to the law of the citus. Here, the United States, the Federal Arbitration Act. So I take the Solicitor General's position to be this. Look, when you have Argentina arbitrating against a company from the United Kingdom, then the Argentine company and — excuse me, Argentina and the U.K. company don't have any ex ante understanding about whether the dispute will be finally resolved by a court or instead the arbitrators, because who knows where the arbitration would occur. Here it occurred in the United States. Our answer is that this objection answers itself. It's true that they don't have a specific judicial system that it will be ahead of time when they sign the treaty, Argentina signs a treaty with the United Kingdom. They don't know whether a dispute over this precondition will be resolved de novo or instead it will be resolved deferentially, because they don't know where the arbitration will occur. But they do know that the applicable law will be the citus of the arbitration. And there is precedent on this. The government's argument here is about international arbitration governed by the New York Convention. There are 149 signatories to the New York Convention. There have been thousands of challenges to arbitral awards under the New York Convention. And we are unaware of any precedent from any country ever that says we are going to not apply our domestic system or set of rules here, the House and First Options lines, because this is an international case. We know that the country is not going to do that. Alito, I'm not sure that this argument helps you, but it's your argument. But this arbitration took place in the United States because the parties agreed that's where it would take place, right? Correct. So your argument is that by agreeing that the arbitration would take place in the United States, they bought into U.S. arbitration law no international modification? That's correct. And that is what has been true in every New York Convention case ever decided in the United States. And so far as we are aware, every case decided by every New York Convention signatory, because they have to be accepting a body of rules when you are trying  They agreed to put it here. That's how it works. See, I would have thought that there would be an argument for saying that the First Options principle shouldn't apply to international or to a bilateral investment treaty. The whole point of these treaties, as I understand it, is to take these disputes out of the courts because of distrust, at least of the courts of the country against which the claim is asserted, and put it in an international tribunal where some sort of standard international principles would apply. But that's not you don't like that idea. No, that's part three of the opinion. I just haven't gotten there. Here's the reason why, and that is the government's argument about the New York Convention doesn't have anything to do with investment treaties. It's about the New York Convention. And so it would apply for a company from Japan to use a company from Ecuador, and they arbitrate in the United States. So the government's position has very wide-ranging consequences for any international arbitration in the United States. Now, Argentina does make the argument that you've described, and this is the next part of the opinion. If we got past the government's position, which I don't think has any precedent for having a special international rule, we come to Argentina's argument. And Argentina says this. Look, the reason this isn't Howsam is that this is a unilateral contract, effectively, and that is we put our treaty out there, and now BG Group has to do something in order to create an arbitration agreement in the first place. Because we don't have an arbitration agreement with them, we haven't consented to arbitration, then because of that, call it a precondition, call it whatever you want, because an arbitration agreement hasn't formed, the arbitrators have no power to decide anything, and therefore you can't defer to their judgment. We would never expect them to have the power to decide anything, Argentina says, because there's no arbitration agreement at all. So that's the next part of the opinion, and it will get to the points you raised, Justice Alito. Alito, could I ask you just a practical question, and maybe the answer to this is obvious. Is it too late now for you to begin litigation in Argentina, wait 18 months, and then pursue arbitration? It is not. There is a principle of latches, but there is an equivalent principle of equitable tolling. So it's true that we could go there. I do think ultimately it's a point in our favor, because it shows how pointless this exercise is. We'll recall, of course, that while we could file a claim in the Argentine courts, the Argentine courts, of course, would have the power to do nothing at all. They couldn't fine us. They couldn't fine Argentina. They wouldn't have to decide the case in the first place. And then we would be back here. And the question is, if you have a provision like that, which is effectively go wait in the Argentine courts, does anybody seriously think that that determines your consent to arbitrate, when it is that that act, going and sitting, can't have any effect on the case whatsoever? Do we really believe that? Well, that's not true. There are numerous statutory regimes where Congress has decided, for example, it's valuable to give people a period of time to negotiate or discuss before you can go into court. The EEOC and other sorts of things say, let's everybody step back. You have to negotiate for 6 months or you can't sue for another 8 months. And a lot of times nobody thinks that's going to change anything, but you can understand Argentina or any other country saying, look, before we're going to arbitrate, you know, try our courts. You may find you may be surprised. Right. We would be, but, Mr. Chief Justice, my point isn't that it's not important. I'll give them that it's important. They negotiated for it. My point is that whether it's important or not doesn't tell you if it's a procedural step or a substantive step in terms of their agreeing to arbitrate with us. My point is that it's not important. Kennedy, let me just make clear where we are. Suppose we, or at least I, were to conclude that the court of appeals was right, that there is, it is for the judicial branch to decide whether there's an arbitration agreement and a duty to arbitrate. Then I would have further to conclude that given Argentina's position, they have waived the judicial requirement and that this arbitration should proceed. I can't reach that second question because it wasn't raised. Justice Kennedy, the way you would resolve that issue, I believe, is to get to Argentina 's argument that it did not consent to arbitration, that there's no arbitration agreement in the first place. You would have to go outside the question presented to begin with. Remember the question presented that you granted certiorari on, to resolve a very distinct circuit conflict that the urging of the arbitration community was, what do we do if we have an arbitration agreement and this is a preconditioned arbitration? If you were going to decide the antecedent question, the question before that, is there an arbitration agreement at all, which is my part three, it's the argument that Argentina is raising in this Court, then I think you have to carry it all the way through. Kennedy, I think there is, this is a close case, I think there is substantial merit that the United Kingdom court is correct and that the court of appeals here is correct as to the authority of the court to decide the issue. I also think they're probably wrong on the merits, but I cannot reach that second question. It wasn't presented. Well, I agree with you, Justice Kennedy, that if you were asking me, did the D.C. Circuit correctly interpret the treaty and decide that, I misunderstood you. You have asked me, look, I see the D.C. Circuit's decision, and I, which is three sentences long on the question of whether they can invoke this waiting period, and I see the arbitrators, they're the experts, it's much more substantial. If you accept the United States' argument to remand this case, which neither of the two sides agree on, then it could be, you could suggest to the D.C. Circuit, reopen it. But otherwise, I'm going to agree with you, Justice Kennedy, I'm a believer that you should stick with the question presented and the arguments that are properly presented to you. Let me try, then, to deal with your point about the United Kingdom court and the point about how courts decide if there is an arbitration agreement. We actually agree that you, you are obviously a court, you need to decide if there's an arbitration agreement here. You do decide that, De Novo. The point that I want to get to in the part three of an opinion that I'm imagining is that there clearly is an arbitration agreement here. And I'll — I'm going to come to that in one second. I would just bracket the point about the United Kingdom. Remember that, as I said with the New York Convention, the United Kingdom has one system for reviewing arbitral awards. Switzerland has another. We have another one. What you need to look to, I think, is your own body of law, because each one of those systems is because of not some great principle. But, Mr. Goldstein, you have given us three parts for an opinion. Is it your position essentially that under this bilateral agreement, the case is to be decided by an arbitrator, not by a court in Argentina or the United States? And so the question is when, that an arbitrator will decide the case. And so the question of when doesn't say whether there's an agreement or not. It just says that you sued too early, you started too early. Is that your essential position, that this bilateral agreement says arbitration is the way this dispute gets decided? And everything on the way to that is what you call a preliminary question. But essentially, the parties have agreed that their disputes will be solved by arbitration. Goldstein, Yes. And can I maybe take you to the treaty itself and explain what I think are the questions for courts and what I think are the questions for the arbitrators? Because I actually think it's pretty clear from the treaty. It's in our blue brief in the appendix. But, Justice Ginsburg, the answer to your question is yes, and I'll explain how that plays out under the treaty. So this is the agreement that Argentina made with the United Kingdom, and the dispute resolution provision starts at page 8A. It's Article VIII. Now, there are three conditions in this agreement on Argentina's consent to arbitrate. It does have to agree, and we had to do something, we had to invest. And those three conditions are set out in the first sentence of the dispute resolution provision. It says, and I am now in Article VIII, Roman I, disputes with regard to an investment. So this arbitration provision is only going to apply to an investment, which is a defined term under the treaty, which arrives within the terms of the agreement. So it has to be a treaty claim between an investor of one contracting party and the other contracting party. And so that is, it has to be a U.K. investor suing an Argentine or seeking to arbitrate against an Argentine company. And those are, if those things aren't true, there is no arbitration agreement. Now, that language that I just read to you is from the local litigation provision, and then the treaty says the exact same body of disputes are eligible substantively for arbitration. That's what it is. Roberts. It seems to me this is a difficulty for you. The structure of the treaty, I mean, if you just end it after one, nobody would say, oh, well, they must be contemplating arbitration, or arbitration is in the background. They say, look, you've got a dispute, if you don't resolve it, you bring it in court. Nothing about arbitration even in the background. Then they say, if you want to go to arbitration, you can. So when you look at just the structure, it seems to suggest that Article 1, 8.1, is not part of the arbitration provision. It stands there and says this is what you do, and then the arbitration kicks in later. I'll agree with that, but I just don't think you can ignore the rest of it. And so let me explain why that's true. So as I said, those three conditions apply to the arbitration provision. So I'm at the top of 9A. The aforementioned disputes, those are the ones that meet the three conditions, shall be submitted to international arbitration. And then, Mr. Chief Justice, it turns immediately to the relationship between the local litigation and the arbitration. And it's common ground that in the example that you gave, if you had just Part 1, and I just think it's really important by you, Mr. Chief Justice, and that is, if this was Article 8, you know, arbitration of disputes, or, you know, parties can arbitrate   It would be a completely different case if the arbitration provision were to say, go to the local courts, come what may. This would be a completely different case. But this provision is wildly different from that. It says, go to the local courts. Whatever they do, it makes no difference. It cannot stop the case. It can't change the issues that will be arbitrated. It can't have any effect on the arbitrator's decisions. It is exactly like a waiting period, which exists in every international dispute. Roberts Your argument would be better there if this was Article 8, you know, arbitration of disputes, or, you know, parties can arbitrate, but first they must do this. No, it just says, you know, settlement of disputes. The first thing is, you can go to court here. The second thing is, if you want to arbitrate, you do this. Shanmugam Okay, Mr. Chief Justice, but then I would just take you to the next page, sub 4, and we understand what the answer to that ambiguity, perhaps, is, the last sentence is, the arbitration decision shall be final and binding on both parties. That is the only body under this treaty that can issue a decision that decides the party's dispute.  Now, I take it that this is a case where the arbitrators are the only ones who can decide the parties' dispute. Roberts If you want to accept the invitation to arbitrate, that is in 8-2. If you don't, if you go to 8-1, which doesn't say anything, then presumably the decision of the tribunal will be binding. Shanmugam Fair enough, Mr. Oh, no, that's not quite right, Mr. Chief Justice, because, remember, imagine that we went to the Argentine courts, and for the first time ever we won. And so that an Argentine court told the Argentine State, you know, we actually think you should pay this company $200 million. What would happen then is that Argentina can take the question to arbitration. Nothing about the local court's decision binds anyone. We — there is never a point at which you can say that the investor will abide by or be bound by a decision of an Argentine court under the system. That's what's so unusual about it. Perhaps I can explain why it's there, because it is odd, I will tell you. And I will tell you that in deciding this question that Argentina is adding to the case, in the context of this local litigation provision, it is a very strange vehicle to do that. There are only — only 1 percent of bilateral investment treaties have this provision. They — it's a historic remnant. It is in the first 15 bilateral investment treaties that Argentina agreed to. It's in nine of them. In the subsequent 40 of them, it doesn't appear at all. Again, a good example of how it isn't really a condition on their consent. And it is a remnant of an era of espousal. It used to be the case before these treaties that an investor in BG's position would have to go to the Argentine courts. And when Argentina first created the investment treaties, it kind of liked the idea that you had to spend some time in the courts, but no one would agree to the treaty. This is Justice Alito's question earlier. No one would ever agree to these treaties if they didn't know that the decision maker would be the neutral expert arbitrators. And so it just has this you-have-to-wait-in-court feel to it. But it is absolutely critical that we look at the substance of the provision. It's very much, Mr. Chief Justice, like the John Wiley case, which was structured one, you will have step one of our grievance process, step two, within five days you have to go to our next step of the grievance process, step three, then you can go on to arbitration. It could have stopped, theoretically, at any of those. If you had given up at step one or two, you would well have been bound by it. But the question you are being asked here, if we could just return to you're trying to decide this de novo or instead defer to the arbitrator's interpretation of whether this litigation provision is binding, is fundamentally, when Argentina went into this treaty, did it think that the arbitrators were going to resolve the disputes, right? Did it expect — it's a question of consent, Justice Sotomayor — did it expect that the answers to these questions would come from the arbitrators or instead the courts? And when we are talking about the process for getting it going, Justice Ginsburg talked about the timing. Do you have to do this for 18 months? There's another provision here about 3 months. The natural understanding is that there is an arbitration agreement. Argentina knew that it could only get this treaty if there was a guarantee to the investors that they would be able to arbitrate, and so expects the arbitrators to decide this. Imagine Argentina's world, if you will. Argentina's world is that every timing question, whether something has to be filed on blue paper, I have no idea what the line they want to draw is. Every procedural step is instead a condition on its consent to arbitrate. And that doesn't seem to make any sense at all. There have to be procedural prerequisites. And Argentina would recharacterize this as, as I said, a unilateral agreement. So it's like Argentina says, posts a sign on a pole and says, if you pay me $100 — if you find my dog, I'll give you $100, and so you have to perform an act. And it says we have to perform an act here. We have to go to the local courts or otherwise there's no agreement at all.  Arbitration is not a dog. And Article 8, if we just go back to page 8a, does not require us to submit it to the local courts at all. This can't be a step that we are required to take because we are not required to take it. If I could just take you to the last two lines of it. It shall be submitted at the request of one of the parties to the dispute. Argentina was just as entitled as us to put this into the local courts as we were. It can't have been an expectation that we had to do something before it would consent to arbitration. And so I do think that this is just on all fours with John Wiley for that reason. The only other thing that has been put on the table in front of you is the question of whether Argentina's sovereignty should make a difference here. And this is kind of the second theme of the brief of the United States. And I would say about that, that the Foreign Sovereign Immunities Act, which was discussed, of course, in the last argument, has an express waiver of sovereign immunity for arbitration awards that's controlled here. And if when the Solicitor General's representative speaks, if that person were to talk about what the treatment of these issues in other countries is, we are unaware, again, of any country in the world where the arbitral system of review in the courts changes in the slightest because one party happens to be a signatory to a treaty. And that makes a ton of sense. Again, this is fundamentally a commercial relationship. Argentina knew that it couldn't, in the crisis that gave rise to these investment treaties, Argentina couldn't get the money to come into the country if it hadn't agreed to arbitration. Sotomayor, what do you do with Wintershell? So, Your Honor, I think that there are a variety of cases out there that deal with the question in other jurisdictions of different ways of reviewing arbitration awards, and those are unique to their own arbitral system. We've cited decisions from France, for example, that follows your Howsam line. The important point I would make is that there is, when the other side points to decisions in which a court reviews de novo a jurisdictional ruling of an arbitral tribunal, none of those decisions are unique in any way to the fact that it was an international arbitration or an international treaty arbitration. Their international rule, the U.K. rule, the rule in lots of other countries, is simply about arbitration. The reason that the other side can say that this case might well be reviewed de novo in the United Kingdom, for example, is that the jurisdictional decision in essentially every arbitration of any kind in the United Kingdom will be reviewed de novo. They just have a different approach to these questions. Ginsburg. Isn't that the same thing in France, which is supposed to be a popular place for international arbitration, that in the first instance the arbitrator decides, but ultimately the court can review everything? That is not the most current view, Justice Ginsburg, in a case called Nijhan Plast, which was the most recent court of appeals decision in France in 2004. The court adopted the procedural substantive distinction that very much parallels Justice Breyer's opinion in the Housam case. But even if it were the case, it's because the French have their own approach to arbitration. We have a system that says, look, if you can always run off to court because of any of these procedural objections, it has to be on blue paper, you didn't write 30 days. Another great example would be in lots of arbitration provisions, you have to submit a sufficiently detailed statement of claim to the arbitrators. Well, that would be the case. Kennedy. Do I understand your position that in this case you did not have to go to the Federal to the Argentina court by reason of the language in this agreement and not by reason of anything that Argentina did? The language in the agreement meant that what Argentina did disentitled it from being able to rely on this provision. I'll take you quickly, if you don't mind, to the provisions of the treaty so you know what I'm talking about. There are two of them. One is the one that the arbitrators relied on, and that is in the arbitration provision, 8-4, which is on 10a, says that the arbitral tribunal shall decide the dispute in accordance with the provisions of this agreement, the laws of the contracting party involved in the dispute, including conflict of laws, and then at the end of the tribunal, the principles of international law. So this exhaustion requirement, it's not even an exhaustion requirement, the local litigation requirement is subject to international law. And then earlier, and so three other tribunals have reached the same conclusion as this one, that you, for that reason, that provision, you can't rely in the particular circumstances on the local litigation. And then Article III. Sotomayor, say that again. Oh, sorry. There are three other tribunals that have reached the same conclusion as this one, and that is Argentina can't rely on the local litigation provision because it effectively closed the courthouse doors. Its own conduct disentitled it. Then 10 other tribunals have reached the same conclusion based on Article III, the most favored nation provision, because this requirement doesn't exist in the Argentina-U.S. bids. There are only three tribunals, to be clear. Only three tribunals out of 16 or 17 have agreed to enforce it, if I could reserve the remainder of my time. Thank you, counsel. Ms. Anders. Mr. Chief Justice, and may it please the Court. The government's position in this case is based on the fact that this case involves a bilateral investment treaty in which the State's parties set forth a standing offer to arbitrate in the treaty itself. Because it's the treaty that determines whether there is an arbitration agreement in this case, principles of treaty interpretation have to be used to assess whether there is an agreement. So, therefore, applying the domestic law presumptions that are set forth in Housum to this type of investor-State arbitration we think would not be appropriate. Housum shouldn't apply by its terms, because the question here is a question of treaty interpretation, not a question of the likely expectations of parties to a domestic commercial contract. I think a— Scalia. I must say I don't follow that line of argument. I mean, it seems to me the treaty sets the framework for an agreement, but it is ultimately the agreement that governs. Well, there is no agreement unless the investor submits the claim to arbitration in accordance with the terms of the treaty, the conditions on the State's consent. So, for instance, in United States investment treaties and free trade agreements such as NAFTA, the United States says that an investor may submit a claim to arbitration only if it first satisfies certain procedural conditions. Breyer. I can't find it. It seems to me this is sprung full-blown from someone's brain that is not well-embedded in any law that I could yet find, that is the — it's not meant to be rude. I'm trying to figure out where this idea of the consent thing comes from. After all, it apparently comes from our Korean treaty and maybe one other, but I can't find it in — I can't find it. The question in the case is, is this particular agreement, namely an agreement to go to the court first, shall we count it as that kind of matter as to whether this is arbitrable that goes to a judge, or rather is it that kind of procedural, howsome, wily type thing that goes to an arbitrator? Now, we did our best, I think, to try to explain how to distinguish the one from the other in our precedent. Now, you use different words. You use these words about consent, which doesn't appear anywhere in this treaty. But I think you're trying to get at the same thing. And if you're not trying to get at the same thing, why? Why not? What are you trying to get at? Well, I think the reason that applying howsome and its presumption that certain procedural-type requirements, like notice requirements, would be decided by the arbitrator, the reason that would risk subjecting a State to suit without its consent is that in investment treaties what the States do is they say we will be subject to arbitration under certain circumstances. But they also place limitations on their consent to that adjudication in order to satisfy important sovereignty. So if, in fact, there was a State that said, look, they don't say anything in the treaty, but it turns out for purposes of counting time limits, filing a brief, they count Saturdays, but they don't count Sundays, all right, and the government says, quite sincerely, if we had known that they were going to do that, we never would have agreed. I'm trying to get an example of something that is as purely procedural as I can imagine, something no one in his right mind would think a judge, rather than an arbitrator, should decide. But under your rule, you're going to say the judges decide that and not the arbitrators. And that's what is bothering me about your rule. Well, they decide them because the State set forth in the treaty itself that these are limitations on their consent. So if it's a treaty that you can't do that, you can't do that. By the way, in the treaty itself you can have dozens of things, as was true of howsome. We will follow the UNCTAD, whatever that is, the U.N.C.I. or AAA rules, and you look up AAA rule number 1872b, and it says just what I said, okay? So now it's in the treaty itself, and why should that matter? Because, for instance, what the United States has done in negotiating its treaties and free trade agreements for decades in every one of these agreements is it has said  We've only found two, by the way. One was Korea, and I can't remember the second. Well, we cited in our brief the Korea U.N.C.I. and NAFTA. But in any case, you explicitly say these are our conditions of consent. And you raise the question to me. You don't answer it. Because suppose one of those conditions had to do with blue paper rather than white paper. Suppose that they were just what I said. Nobody still would think the United States was resisting arbitration on such a matter. Well, to give you an example of a condition that we've actually used, NAFTA requires as a condition on the United States' consent to arbitrate that the investors, when they submit the claim to arbitration, they waive their right to pursue other remedies. And that satisfies very important sovereign interests that we have in not being subject to parallel treaties and government coverage. Breyer's I gather that the U.N. rules, the AAA rules, the scholars who file our briefs, the doctrine of competence, competence, whatever that might be, is, in fact, far broader than what they want. It submits virtually every question of arbitrability to the arbitrator. And the United States is taking a position quite contrary, I guess, to most of the world. I don't think that's correct, Justice Breyer. What we are saying is that when a condition goes to consent, whether it is fulfilled or not, it goes further down. Ginsburg. How do we know that? The question is, is this litigation preliminary, going to the Argentinean court, is the litigation preliminary a condition on the consent to arbitrate a dispute? What is the answer to that question in the view of the United States? That's a question of treaty interpretation, and this Court has said that you look to first the text, but you also look to the text. Oh, I say you've done all that. And what is the United States the United States is saying, you should look to all these sources, and then answer the question, is the litigation preliminary a condition on consent to arbitrate the dispute? So after looking at the sources that the United States is telling the Court it should look to, what is the answer of the United States to that question? Well, the United States doesn't feel that it's appropriate for it to express a definitive view on that question now, because the parties have not argued this, really, as a question of treaty interpretation.  And I would feel better about that argument, Ms. Andrews, if you had at least suggested how we should go about deciding that question, because you read this for your brief, and I don't know what a consent-based objection is. In fact, you say consent-based objections can look very, very procedural, and it's still consent-based, or it might not be consent-based. So all the techniques that we use in the Howsam first options line of cases seem to go out the window and not be replaced with anything else. I don't think that's right. I think what you look to, just looking at the text, you can look to whether the text expressly calls something a condition on consent. So, for instance, in NAFTA, NAFTA says that there are certain conditions present. Scalia, but I offer my opinion. Scalia, that's no different from the rules we apply when there isn't a treaty. Of course. I mean, if the arbitration agreement said that, that the, you know, the agreement is conditioned on it, of course. So what else? What different rules would you apply, other than the common-sense rules that we use for arbitration agreements? Well, you would also look possibly for mandatory language in the treaty. So, for instance, if the treaty says that we would look to mandatory language in the arbitration agreement. I think that's right, but the problem with applying Howsam is that it's a presumption that purely based on the nature of the requirement, so the fact that it is a notice requirement, the fact that it is a time limit, that that means that it's procedural and, therefore, the arbitrators would decide unless it's cleared under the 11th. Alito, what about this principle? If something, if some requirement seems to serve virtually no purpose, it's unlikely to be a condition of consent. Would you accept that? No. I think that is still, that would be grafting on a default term onto the treaty that may not reflect the treaty party's intent. I think when States negotiate for these conditions on consent, what they are looking to do are. Well, there's nothing in the treaty that talks about consent at all. So we have to decide whether some requirement is a consent, is something on which consent is conditioned, or is it just a procedural requirement that would be decided by an arbitrator. Would you not, would you disagree with the proposition that if something really is trivial, doesn't seem to accomplish much of anything, it's a historical vestige, unlikely to be a condition of consent? I think that one of the things the Court could look to is the nature of the requirement. So does it serve sovereign functions? But I think in doing that analysis, it's important to look to what the State says are the functions that its requirements are serving. So, for instance, our notice requirements in our treaties, they serve the purpose of giving us advance notice of particular claims and time to correct problems that may have been caused, you know, that we can correct and therefore avoid arbitration to begin with. So I think you would look to the nature of the requirement, the text of the treaty, whether it's mandatory, whether it's expressly conditional. You can also look, obviously, to what this Court has called aides of interpretation so that would be the post-ratification understanding. If this were our treaty, we would bring in, you know, the letter of transmittal that the Senate had, that the State Department had provided after it had negotiated the treaty. You know, there would be a lot of information like that that a court could look to. And I think as the Court noted in the Sumitomo case, you can have similar language in similar treaties that have different meaning because there's different negotiating history or the aides to interpretation point different ways. So our point here is that it's a matter of treaty interpretation and that you simply have to look to the text of the treaty. Breyer. What's wrong with the House? I'm being a little defensive here, but I didn't think there was the presumption you're talking about. I thought it said there's a presumption about that procedural rule, and I thought important language was the language that the Court has found the phrase, i.e., for the judge, applicable in the narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter. Now, that, it seems to me, a little bit easier to work with than this notion of whether a State gave consent or didn't give consent where it doesn't mention it in the treaty. I'd like to answer that. Breyer. Briefly. Thank you. I think in the treaty context, the State's parties are not agreeing and they don't have expectations with respect to the allocation of authority between the court and the arbitrator. What they do agree to are conditions on consent that limit the terms on which the State may be subject to arbitration at all. I see. Thank you, counsel. Mr. Chief Justice, and may it please the Court. This is a contract formation case, and it's a case that's decided properly by the court below whether you apply first options or whether you apply treaty principles. They get you to the same point. Ms. Blattman, may I ask you preliminarily, on your view, what happens next? Can this party, I suppose you're right, can the BG group institute an action in Argentina and, if it's not resolved within 18 months, invoke arbitration? Absolutely, yes, and my friend conceded that. And if it is resolved, but not to BG's liking, then there, too, BG can invoke arbitration. That's absolutely correct, Your Honor. Well, doesn't that mean that the treaty partners agreed that only an arbitration panel can conclusively resolve this dispute? What the treaty partners agreed here, Justice Ginsburg, was a condition, a precondition on their respectively derogating from their sovereignty. Absent the bilateral investment treaty, there is no basis on which an investor could ever compel one of these States to arbitrate its claims, and its only remedy would lie in the courts of that State. I don't get your answer to my question. Am I wrong in thinking that under this treaty, the ultimate decision-maker is the arbitrator? There is no provision for the Court to be the ultimate arbiter of the controversy? It depends on the issue. The arbitrator will decide the merits, assuming the offer to arbitrate has been accepted according to its terms, which was never done here. After that, depending on the issue, there will or will not be judicial review of some And what this Court said as a matter of U.S. law in first options, and what all the other countries say, and our brief really was not disputed on that point, is that issues of jurisdiction, whether a contract was ever formed, whether there ever was an agreement to arbitrate, is ultimately an issue for a court to independently de novo decide. Scalia, why are you complaining about the other party not initiating proceedings in the Argentine courts when, if you really wanted those proceedings to occur, you could have initiated proceedings in the Argentine courts? First of all, as first option said, we didn't need to do that. First option was very clear that it did not require someone who is resisting arbitration and objecting to the arbitrator's jurisdiction because there is no agreement, to run to court, which would also be very bad policy. We don't want people running to court. We want them to try in arbitration, but subject to judicial review, if the arbitrators get it wrong on the fundamental jurisdictional question. Scalia, I must say, I don't understand when you're appealing to a condition for the thing to occur, and you can bring that about as readily as the other side. It's dog in the manger comes to mind. No, we weren't the aggrieved party, Justice Scalia. We were not seeking relief. They are the ones who are complaining. We're the putative defendant, the Respondent. There would be no reason for us to go to court. What our offer to them was, was first of all, you have to go to our courts for 18 months. And then it says in 8-2, and it refers specifically to the aforementioned disputes, i.e., those disputes that have been brought to our courts, those aforementioned disputes can then be arbitrated, quote, under the following circumstances. And the first of those in 8-2, A-1 is waiting the 18 months, and then quite simply and quite importantly, or in 8-2B, the parties can separately agree to arbitrate. Well, if they don't separately agree to arbitrate, which did not occur here, you have to go through 8-2A-1, which is either wait the 18 months so the local court can try to deal with it, and I'll tell you why that's important in a moment, or the local court does actually adjudicate it, and then the party who's unhappy with that does have the right, then and then only, to go to arbitrate. And that's the temporal sequence that the D.C. Court talked about, and it's set forth in the structure of the treaty that the Chief Justice talked about. You go 1, 2, 3, they're in order for a reason. Ginsburg. The D.C. Circuit treated this as there is no agreement until you go to the local court first. That's correct. The argument is that there is an agreement to arbitrate. That will be the method of dispute resolution. You have to take certain steps before. So you have to go to the local court. But why isn't the dispute settlement mechanism decided on by the parties arbitration? And then what you have to do before that is in the nature of a procedural condition. I don't think that's the correct analysis, Justice Ginsburg, because the dispute resolution mechanism, which is, again, is an offer made by two States to each other's investment. Kagan. Can I just ask you to assume for a second that that's not so? If you had BG and the Republic of Argentina had itself entered into this agreement, would you agree that this is a typical, howsome kind of provision? I would actually not, Your Honor. Howsome, let's talk about the facts of howsome. Howsome was — there was no dispute that there was a contract between the howsomes and the broker-dealer to arbitrate under the NASD rules. Those NASD rules themselves contained an eligibility requirement that the claim can't be more than 6 years old. And those same rules also said the arbitrators get to decide about the interpretation and application of our rules. So it was a classic situation. Sotomayor, so how do you distinguish John Wiley, which I think has two components and the second cuts against it? And the first cuts in our favor, Justice Sotomayor. That's exactly right. My friend kept talking about John Wiley as involving only the issues of procedural preconditions. But the first part of John Wiley, where the Court says quite clearly you have independent judicial review has to do with whether there is an agreement to arbitrate at all between the parties. In that case, the party sought to be pulled into arbitration against its will was a successor, and the issue which the Court independently decided was, is that successor a party? Just that. Breyer. Everybody's getting to the same question, I think, but I haven't quite heard the answer. Of course, you're right, in many countries, the question of arbitrability, that is to say, is there a contract, is for the Court. In an investment treaty, I can find a lot of authority that says whether this counts as an investment is a matter for the Court. But the question in front of us, is this that kind of decision, is it one for the Court or is it one for the arbitrator? And to just summarize why it might be for the arbitrator, A, it's procedural, but that's not sufficient. B, it refers to whatever it is, uncontrol. Breyer. Yes. It refers to their rules. Their rules provide all matters of competence over the arbitrator. The scholars have done exhaustive work saying most countries think that. The doctrine of competence competence goes further. And you also have the AAA rules which say the same thing. So those are all against you. For you is the position of the item in the document, first and foremost. I'm trying to summarize what I've got as the arguments for and against. Now, what do you say to make me think there's even more for you? I agree with you the text is key and the text controls. However, I strongly disagree with all respect to your statements about competence, competence, and what other countries do, because we have shown essentially without dispute here, and this is in the third restatement and it's in the case law of all these other countries, that competence, competence, or competence, competence, or if you say it in German with a K, all that means is the arbitrators get the first crack at it. Breyer. So I agree that's not relevant. Not the last word. But those are not relevant. I mean, those are relevant. I'm saying they would go farther. And I think in what I've seen so far, it gives on certain kinds of procedural gateway questions, deference to the arbitrator, which is what is at issue here. And now I'm back to the same question. What is your evidence from this contract that this is not the kind of gateway question that is for the arbitrator? This is, and again, my friend conceded this, this is an offer to a unilateral contract. How does a unilateral contract get formed? Here we're back at our basic contract formation principle. Scalia, I don't think he conceded it. He conceded that that was your argument. I think you both and I misheard him. There's a subtle difference between the two. I misheard him then and I apologize, Justice Scalia. But this is in fact, if you apply ordinary contract formation principles, as the Court says you must do in First Options and in Granite Rock, if you apply those principles, this is classic offer, and the offer, we all know, has to be met by an acceptance on those terms, not on other terms. Alito, you said a few minutes ago you were going to explain why this local litigation requirement is important. And that is important to me because I don't see what it accomplishes. I can understand a waiting period, but this is more than a waiting period. You have a party who doesn't want to litigate in the courts of Argentina, doesn't think it's going to get a fair shake there. What is the point of requiring this? Now, I understand it's a requirement, but if it's not very important, if it isn't going to achieve anything, that seems to me to weigh against the conclusion that it's a condition of consent. It is very important. First of all, as a factual matter, this type of requirement appears in about 8 percent of bids and it is most prevalent in U.K. bids. So this is not some weird Argentine thing. The U.K. thinks this is important. Why? A number of reasons. First of all, a lot of these investment disputes, in fact, the vast majority, involve challenges to some local law, some local regulation. And you want to have the local court have the first look at construing that, just as you would construe a statute before you reach the constitutional question. The local court can illuminate the dispute, the investment treaty dispute, by saying what does our law actually mean? Is our law legal under our Constitution? That's one thing. That's very important. Alito, I'm sorry. I can narrow for you before the time expires, but I don't understand. I don't know what the procedure is in Argentina. Let's assume their civil procedure is like ours. So you say they have to file a complaint. All right. They file a one-page complaint. They do the minimal necessary to keep the case alive in court. Maybe they don't even do that, because they don't care. They don't want the thing to be decided. All they're doing is running out the 18 months. What is achieved by that? Well, but that's their choice, which they, in fact, made here, not to avail themselves of the procedure, which is something to be determined. Alito, let's say they avail themselves of the procedure in only the most perfunctory way, so as to satisfy the 18-month requirement. Why should my client be punished because they don't diligently pursue a requirement of our offer? They say, actually, in their brief, in one sentence, we accepted the offer, and in the next sentence, virtually, they say, we elected not to follow. Sotomayor, could you finish your answer? They're not answering my question. I'm sorry. If they do not litigate the matter in such a way as to get a decision on any of these local law issues, they just keep it alive, perfunctorily, for 18 months, what is achieved by that? Well, they have — well, they've complied with it, but more importantly, it's what could be achieved if they sort of wanted to achieve something, which is, as I said before, constructions of local law that would bear on the investment dispute. That's important. Narrowing issues, making determinations which are not binding, but which are nonetheless perhaps instructive and helpful to the arbitrators. That's another issue. Settlement is another issue. We talked about waiting. We have EEOC. You first have to go to the commission, because the dispute sometimes gets settled. If it doesn't get settled, as I say, it can be narrowed. All kinds of things that would be helpful to an ultimate arbitration, they could win, by the way. Mr. Blackman, could you sort of indulge an assumption for me? And the assumption is that if this provision were in an agreement between two parties, we would treat it as a Howsam John Wiley kind of provision. In other words, we would say that this is just a procedural rule. That's the side of the line it falls on. So my question to you is, why should this be any different? You're treating yourself as though you never made an agreement. But in fact, you did make an important agreement. You made an agreement with the U.K., the entire point and purpose of which was to allow U.K. citizens to bring certain kinds of disputes before an arbitrator. So once we have a U.K. citizen with the right kind of dispute, it seems to me you're just in the position of any other person who's agreed to this provision. And in my assumption, if it's a John Wiley type provision, it should go to an arbitrator. I have a number of responses to that, Justice Kagan. First of all, I don't think it is just a John Wiley sort of step agreement. I know, but I said just assume that for me. And tell me why you are in a position where some other result should go into effect. Well, it's kind of assuming the conclusion. If this is just John Wiley, that's a hard case for us. But the structure of the treaty, with all respect, demonstrates it's not. And that would be true even if this was, in fact, a contract between us and BG. If we had a contract with BG that says you have to sue us first, okay, and then after 18 months you can arbitrate with us, I don't think we would just assume that that translates into you have to arbitrate with us. They are really suggesting here, Justice Kagan, that this elaborate provision boils down to Argentina promises to arbitrate all investment disputes with BG. And that's not what it says. Please. Roberts, it's a point on which I'm regularly confused. You just said if we had this provision in a contract, a private contract, it said you must sue us. But there you have already a formed separate agreement to arbitrate. And it seems to me clear that those, whether you call them preconditions or whatever, that that, the argument that that's for the arbitrator to decide, they may well decide that, you know, you didn't comply so you don't get to arbitrate. But it seems to me typically under first options in House and that is for the arbitrator. Now, what makes it distinct in your case, what, is it just the order that they are in or what? Or is it something special about a sovereign's agreement? It's kind of all of the above. It's the text, the fact that it is in fact an offer by a sovereign rather than a originally bilateral agreement with the private party. But it's also, and this is much of what the case hinges on, is this an issue of contract formation? If it's an offer, it has to be accepted on its terms. And those are formation issues that are just different than construing an existing agreement. Roberts, It all gets down to the question, how do we tell, you know, the contract formation from the blue paper, right? I mean, if it says, you know, we agree to arbitrate and we do these rules and those are on the paper, and they say, oh, we didn't agree to have it not on blue paper, how do we distinguish between those two scenarios? I think you have to kind of look at the language. And here, with all respect, it was clear to the circuit, I think it's we think it's clear, that the consent, which remember, absent which there would be no arbitration, this is a sovereign, going back to sovereign immunity in our earlier case, where consent is expressly put, the word consent is not used, but the clear language of the text and the implications to be drawn from it clearly show that the sovereign is not willing to arbitrate absent the 18 months' recourse to its courts. You should view that as a condition precedent to a unilateral contract that must be accepted by action. And the action is to bring the suit in the local court and wait 18 months. An analogy which may not be helpful, but I thought of it, so I'll give it to you. If I'm looking for someone to paint my house and I make an offer to him, I say, I'll hire you to do it if you post the bond. That's an offer to unilateral contract. He has to post the bond. He can't say, you know, I really don't like the bond or you want a $20,000 bond, which is in my offer, but I'll give you $10,000, now we have a contract. But let's assume we now make the contract and I have progress payments in the contract. Now we have a signed agreement between us that says, I'll pay you, you know, $10,000 per floor. That's the kind of condition precedent within the contract that Howsam, perhaps, addresses. But the first one is the formation issue that First Options addresses. Did the Kaplans ever make a contract? Ginsburg. What would happen in this case if there was a judge's strike, so none of the courts were operating in Argentina? What would happen then? Well, all you have to do is actually file. So if the courts weren't operating, which is an extreme hypothetical, all you need to do is file and wait the 18 months. No, but the clerk's office is closed. Clerk's office is closed, too. I suspect that the — there would be a very strong case to be made to the arbitrators that if the claimant, unlike here, did everything it could to comply, and here, remember, the claimant deliberately, quote, "'elected' not to comply,' the arbitrators might well find that the condition was excused and a reviewing court would be able to do that. No, you can't say that. You can't say that. There is no arbitration agreement under your view. There's going to be an arbitration in the first instance. Kennedy, your whole argument gives me intellectual whiplash. You have to say, well, you have to go first to the court because that's what the arbitration mechanism provides, but there's no arbitration mechanism. No, but in this case, what would happen would be what happened in first options and often happens. One party invokes arbitration. The other party says, I never agreed to arbitrate with you. It would be very imprudent for the defendant in that case to do nothing in default, and you said in first options specifically you don't need to do that. So you present the issue to the arbitrators and you would then argue that there's no agreement, and the arbitrators would say, well, there is an agreement or a condition was excused, and ultimately on judicial review, on your facts, undoubtedly a court would be likely to find, well, of course, they did their best. They tried to comply with the condition. But that doesn't affect, to use my friend's terminology, the question presented, which is who decides in the first instance and then finally. Roberts. Thank you, counsel. Mr. Goldstein, 5 minutes. Mr. Chief Justice, I do have a rule that distinguishes the A-4 paper, and that rule should be, and we think it does follow from the analysis of Howsam, which is just a thinking about when people make agreements and what they expect, is that an arbitration agreement is formed and a party consents to arbitration when they guarantee that the ultimate decision can be made by an arbitrator, not a court. It's form selection. We're going to have the ultimate decision made by the arbitrator. And that rule is applied in the investment treaty context as follows, and it is there is consent to arbitration when the investor is guaranteed that their claim can ultimately be decided by a court and the State can't force it to be ultimately decided by an arbitrator and the State can't force it to ultimately be decided by a court. And I'll show you where that rule, how that line is divided in this treaty, and that is I gave you the three conditions at the beginning. Those are not A-4 paper. You have to be a U.K. investor, you have to have a treaty claim, you have to be suing another party to the treaty. And if those aren't true, then there is no arbitration agreement, and Argentina has every reason to say, I have no idea why these arbitrators are here, this person is from Ecuador, not from the United Kingdom. But on the other things, at that point, once we are a U.K. investor and we've invested in Argentina, that's the performance that's required. Once we did that, then we're protected by Article VIII, the dispute resolution provision. And you look at Article VIII and you say, okay, does that guarantee that you have the right to ultimately have it decided by the arbitrators, or can Argentina actually insist that it will be ultimately decided by a court? And it's the former. We made clear, I think, and nobody disagrees, that they can't force us to go into court and wait for that ruling, take that ruling in any way, shape, or form. Now, my friend says that, look, this is like a unilateral agreement. And this is like where I say, I'll hire you to paint my house if you post a bond. Well, that's a terrible argument for them, because this treaty reads as if he was saying, I'll let you paint my house if you post a bond or I post a bond, because remember, the thing they want us to perform on, supposedly, is something they can do, too. Whoever heard of a unilateral agreement that was conditioned on either party doing something? There's nothing they're waiting for us to do. Scalia. They say that only the complaining party can bring a lawsuit. Evidently, they have no declaratory judgment procedure in Argentina. That — I don't believe that's correct, Justice Scalia. I'm not going to ask him that. I see. I believe the answer, when this was put to them, his answer to your question was, I just don't have to do that. His view was, and it's a perfectly fine position to take, and that is, he's not going to help me win my case. Fine. But it does describe, whether this is a condition on his consent, that he could do it, too. And if he could do it, too, it can't be something he's waiting for me to perform at all. I would also say that on this question of whether it has any value, that all that you got, Justice Alito, was that if I were to pursue the case in the Argentine courts, maybe something would happen. We might learn a little about — about Argentine law. First things first, I don't have to pursue it. Remember, his whole point is, when asked if the courts were closed, is I just have to put the piece of paper down. So if this were a treaty provision that actually involved litigation, involved exhaustion of remedies, where we might learn something, that might be a different case. But this is a waiting period in an Argentine court. And remember, as well, these are treaty claims, and it is perfectly clear and undisputed that the local court, even if it decided the treaty claims, their ruling would not bind the arbitrators. And so he says, well, hey, we might win. That would be the case.  You can just submit the paper. It says you have to submit it to the decision of the competent tribunal. And if the submission requires, okay, now you have to file your brief, and you say I'm not going to, I'm not sure that you've submitted it to the tribunal for its decision. Well, Mr. Chief Justice, I will then say that's a possible argument. But let's figure out who we would ordinarily expect to figure that out. This is a treaty provision. It's the experts involved in treaty interpretation are the three neutral arbitrators who really do this every day. It's what they do. They have enormous expertise in interpreting treaties. And so you might say, and it would be a perfectly valid interpretation, well, maybe submitting it to the local court requires some activity. But do we really expect when the U.K. and Argentina entered this treaty, that it would actually be the Supreme Court of the United States that would be deciding that question, or instead the arbitrators? And if you believe it's the arbitrators, then we win, because it's the kind of procedural question that we put to them purposefully. That's true of the United States. Roberts, It seems to me to be totally circular in begging the question. I don't know that a sovereign would be anxious to submit its sovereignty to three international law experts. And surely they wouldn't, Mr. Chief Justice, but that's the point of the treaty. Remember my friend said, look, if it weren't for this treaty, we could never sue them. That's the reason there's the treaty, because if there wasn't the treaty and we couldn't get relief from them, we would have never invested. And so the whole point of this treaty is to put these disputes into arbitration. There's no special substantive rights in these treaties. They're all customary international law. The thing that matters in this treaty, the thing that matters in all the treaties, is I don't have to have my case decided by an Argentine court. Thank you, counsel. The case is submitted.